

**IT IS ORDERED as set forth below:**

**Date: November 19, 2021**

_Wendy L. Hagenau_
_____
**Wendy L. Hagenau**
**U.S. Bankruptcy Court Judge**

_____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 17-69656-WLH |
| | ) | |
| ERIK K. POOLE, | ) | CHAPTER 7 |
| | ) | |
| Debtor. | ) | JUDGE WENDY L. HAGENAU |
| | ) | |
| NANCY J. GARGULA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ADV. PROC. NO. 19-5096 |
| | ) | |
| ERIK K. POOLE, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AFTER TRIAL

The U.S. Trustee brought this revocation of discharge case against the Debtor alleging that

the Debtor made false oaths in connection with an unlisted creditor and an undisclosed lawsuit.

This Court has jurisdiction of this case under 28 U.S.C. §§ 1334 and 157, and the case is a core

proceeding under 28 U.S.C. § 157(b)(2)(J).  The Court held an in-person trial on the case on

October 21, 2021, at which the Debtor appeared *pro se* and the United States Trustee was represented by David Weidenbaum.  The Court took the matter under advisement and now enters this Order in favor of the Debtor.

## FINDINGS OF FACT

Erik Poole ("Poole" or "Debtor") holds a master's degree in health services administration. He served in the military for a number of years, reaching the rank of major in the U.S. Army.  He worked in commercial real estate from 1996 to 2001 and then again from 2007 (after the end of his duty in the Army) to the present date.  Unfortunately, Mr. Poole has been entrenched in multiple litigation matters since at least 2010.

In 2010, Mr. Poole's now ex-wife, Julie Schneider, filed a divorce proceeding against him in Florida.  Later, in 2011, Ms. Schneider filed a second case against Mr. Poole in Florida, suing on notes he allegedly owed to her.  On August 23, 2012, a divorce was granted to Ms. Schneider and Mr. Poole, but numerous issues remained to be determined including property settlement. Ultimately, the state court decided all of the issues in the divorce in September 2014.  Mr. Poole, however, was unhappy with the outcome and wanted to appeal.  He then approached Mark Lang, an attorney in Florida, to represent him in connection with the appeal.  Mr. Poole signed a retainer contract with Mr. Lang on January 16, 2015, and then an amended retainer contract dated February 26, 2015.  Mr. Poole also executed a promissory note to Mark Lang & Associates on September 28, 2015, in the amount of $55,057.49.  Mr. Poole's appeal was ultimately unsuccessful.

While the divorce was pending, Mr. Poole filed a Chapter 13 bankruptcy case in the Middle District of Florida on April 18, 2014.  The two pending cases with Ms. Schneider were identified on the Statement of Financial Affairs, but Mr. Poole's claim to property in the divorce was not identified in Schedule B.  A Chapter 13 plan was confirmed.  Ms. Schneider obtained relief from

the stay in the Chapter 13 case to continue the divorce proceeding and related issues.  On June 8, 2017, Mr. Poole's Florida bankruptcy attorney, Robert Branson, withdrew from the representation with court permission and over Mr. Poole's objection.  Finally, on October 17, 2017, Mr. Poole's Florida Chapter 13 case was dismissed.  Despite the fact that Mr. Lang represented Mr. Poole as special counsel during the pendency of his Florida Chapter 13 bankruptcy case, he was never approved as counsel by the bankruptcy court and approval of his fees was never sought nor obtained.

After the unsuccessful appeal of the divorce action, on April 16, 2016, Mr. Lang attempted to impose a charging lien for fees in the amount of $66,293.49 on Mr. Poole's interest in the divorce action.  In response, Mr. Poole retained another counsel to oppose Mr. Lang's request for a charging lien.  Mr. Lang's attempt to obtain a charging lien was ultimately denied by the state court on January 18, 2017.  The lawyer representing Mr. Poole in opposing Mr. Lang's charging lien suggested to Mr. Poole that he consider suing Mr. Lang for professional negligence because his work was allegedly poor and his bill was excessive.  The lawyer also noted Mr. Lang may file a suit against Mr. Poole to recover his fees and it would be better if Mr. Poole sued first.

As a result, Mr. Poole retained James Kelaher, a Florida lawyer, to pursue a malpractice action against Mr. Lang.  On May 18, 2017, a complaint for professional negligence was filed in Florida styled Erik Poole v. Mark P. Lang Esq. and Mark P. Lang PA d/b/a Mark Lang & Associates, alleging professional negligence and violation of Florida's Deceptive and Unfair Trade Practices Act.  Mr. Poole requested damages in excess of $15,000.  Later, Mr. Kelaher associated Richard Allen of Mateer Harbert of Orlando to assist him in the case.  Mr. Lang answered the complaint and counterclaimed for recovery of his attorney's fees on June 9, 2017, but Mr. Poole was not aware of the counterclaim.  Discovery then ensued with Mr. Lang serving interrogatories,

requests for production of documents, and requests for admissions on Mr. Poole's counsel from June through December, 2017. Mr. Kelaher sent the interrogatories, requests for production of documents, and requests for admissions to Mr. Poole on June 23, 2017, June 29, 2017, August 1, 2017, August 5, 2017, and November 1, 2017. Mr. Poole provided some responses and provided notarized signature pages. At Mr. Kelaher's office's direction, several of these notarized pages were executed in blank, without Mr. Poole having the responses to which he was swearing. Nevertheless, Mr. Poole returned either responses or signature pages to Mr. Kelaher on August 23, 2017, September 18, 2017, and November 22, 2017. On August 13, 2017, in response to an inquiry from Mr. Kelaher's office, Mr. Poole prepared an email explaining his calculation of damages caused by Mr. Lang's alleged malpractice. He estimated the damages to be between $990,000 and $2.1 million.

Mr. Lang sought to dismiss the lawsuit and on December 7, 2017, the Florida court held a hearing on Mr. Lang's motion to dismiss the malpractice complaint. Mr. Poole, however, was unaware of the hearing. On February 1, 2018, Mr. Poole sent an email to Mr. Kelaher, Mr. Allen, and their staffs expressing concern about his case. The email stated

> Jim:
> I have been getting increasingly concerned about not much of anything occurring in my case other than cancelled dispositions (*sic*) this past fall.
>
> Since I haven't heard anything since December 18th's email, this morning I went on line, found the case and read that my case has been dismissed? It also gave indication that Lang is successfully counter-suing me and there is a hearing on February 5?
>
> This is scary where are we.

This is the first time Mr. Poole became aware of Mr. Lang's counterclaim or his motion to dismiss. Mr. Kelaher responded, explaining more to Mr. Poole about the status of his case. On February 5, 2018, Mr. Poole's attorneys filed an amended complaint against Mr. Lang. On the same date,

partial summary judgment was granted to Mr. Lang for his fees identified in the promissory note in the amount of $55,057.49, plus interest and costs, for a total of $68,631.47.  Subsequently, on April 4, 2018, Mr. Kelaher filed a second amended complaint against Mr. Lang on behalf of Mr. Poole.   Mr. Lang, having obtained a partial summary judgment against Mr. Poole, sent interrogatories in aid of execution which were forwarded by Mr. Kelaher to Mr. Poole in the summer of 2018.   On December 24, 2018, Mr. Poole filed a *pro se* motion to void the partial summary judgment.  This motion was denied.  Finally, on January 17, 2019, the Florida court granted full summary judgment to Mr. Lang on Mr. Poole's complaint for malpractice based on judicial estoppel.

Throughout the period of litigation against Mr. Lang, Mr. Poole was actively involved in the case and followed up with his counsel multiple times.  Mr. Poole's email to Mr. Kelaher on July 2, 2017, refers to having met with Mr. Kelaher and Mr. Allen the previous week.  Mr. Poole sent another email on July 17, 2017, asking when the lawyers needed him to come down again.  On August 1, 2017, Mr. Poole emailed Mr. Kelaher, Mr. Allen, and a staff member the following:

> I have not heard anything since our meeting last week.  So where are we?  Did the court grant an extension for the filing deadline that passed after my office visit last week?  Did we file the answers I provided?

He continued to follow up about his case throughout the fall of 2017.  On November 17, 2017, Mr. Poole sent another email to "Lynda" at Mr. Kelaher's office regarding interrogatory responses.  On November 21, 2017, Mr. Poole emailed "Lynda" explaining that he was having trouble finding a notary willing to execute a blank verification of his responses to interrogatories.  Finally, on November 28, 2017, Mr. Poole sent another follow-up email to "Lynda" asking for copies of the completed answers to the discovery.  He also asked the following:

> Is there anything else that you need from me currently?  I am still curious as if Jim and Rick have received what they need from me.  I ask because I have sent a number

of items over the past few months but there is no response or comment.  I do not want to assume the old expression "silence means consent" if there is something missing.

Any idea when the deposition(s) will be rescheduled?

Sorry for the questions but this case is extremely important to me (and my kids) so I want to make sure we are not missing anything.

Mr. Poole followed up again with "Lynda" on December 15, 2017, asking for a response to his November 28, 2017, email.  He continued to follow up into the new year.  On March 4, 2018, he sent an email with specific questions: "Has the court agreed to hear our complaint? … and #2, with regard to our case against Lang that was dismissed without prejudice and our plan to rephrase the original complaint, where are we in that process?  Do we have to re-file within a certain time frame?"  He sent another email on April 9, 2018, stating:

Forgive me if I am pestering everyone but I haven't heard anything in about a month.  I did go online and read the order about amending the filing against Lang which I believe is today or tomorrow.  Can someone send it to me so I can keep up with our progress and where we are?  Would it be helpful to get together any time soon?

Despite all of this activity occurring during the time of Mr. Poole's Florida Chapter 13 case, nothing about his claim against Mr. Lang or the retention of Mr. Kelaher and Mr. Allen appears to have been brought to the Florida bankruptcy court's attention.  On June 20, 2017, Mr. Kelaher and Mr. Allen instructed Mr. Poole to notify the bankruptcy court and seek abandonment of the malpractice claim so they could continue to pursue it.  By that time, though, Mr. Poole's Florida bankruptcy attorney had withdrawn, payment ceased on Mr. Poole's plan, and his case was ultimately dismissed.

With the Chapter 13 case in Florida dismissed, Mr. Poole decided to file bankruptcy in Georgia.  He met with a bankruptcy attorney, Ed Danowitz, on October 25, 2017.  The two had a two-hour meeting in which they discussed the case and Mr. Danowitz gathered information.  Mr.

Danowitz reviewed Mr. Poole's prior Chapter 13 case and believes he gave Mr. Poole a brochure with a list of documents he would need including pleadings in any cases.  Mr. Danowitz does not have a specific recollection of providing this brochure, but it is his practice to do so.  At this initial meeting, Mr. Danowitz and Mr. Poole discussed Mr. Poole's litigation with his ex-wife and the status of the divorce and a potential claim that Mr. Poole might have against his Florida Chapter 13 attorney.  Mr. Danowitz has no recollection of the suit against Mr. Lang being discussed. Nevertheless, on cross examination, Mr. Danowitz acknowledged it is possible Mr. Poole mentioned a malpractice action against Mr. Lang, but that Mr. Danowitz confused that malpractice action with the potential malpractice claim against the Chapter 13 attorney.  He acknowledged Mr. Poole's "communication was not as clear as I hoped" and he might have misinterpreted Mr. Poole's communication.  Mr. Poole thought the suit against Mr. Lang was discussed and further that Mr. Lang's information would have been obtained upon Mr. Danowitz's review of his prior Chapter 13 case.  He also stated he did not realize the term "creditor" included parties to lawsuits.  He thought it only meant creditors that had extended credit "like Sears".

On October 26, 2017, Mr. Danowitz sent a draft of the Chapter 7 Schedules and Statement of Financial Affairs to Mr. Poole.  This draft was completed largely using the information in Mr. Poole's Chapter 13 case.  On the Statement of Financial Affairs where it is necessary to check "yes" or "no", Mr. Danowitz explained that if no information is provided, the computer program automatically checks the "no" box.  Mr. Danowitz asked Mr. Poole to review the Schedules and he specifically asked Mr. Poole to provide information for Schedules I and J regarding his income and expenses.  Mr. Danowitz's email to Mr. Poole stated:

Attached is a preliminary draft of the petition and schedules.
1. Schedule B, describing property, contains default amounts or estimated numbers. Please insert the values and any better or more detailed description of your assets.

2. Schedules D/E list creditors.  I listed the creditors that filed claims in your Chapter 13 case …

3. In Schedules D/E I listed the creditors who filed claims in your Chapter 13 case.  In the original schedules you listed others … I can add those before we meet next week.

4. Schedules I and J are blank.  You will need to provide a detailed budget of income and expenses.

5. The Statement of Financial Affairs requires you to list income, YTD, and income for the past two years.  All are currently blank.

Please try to get me your comments, corrections, and additions in advance of our meeting next Wednesday.

Because Mr. Danowitz had the Florida Chapter 13 case as a template, he did not ask Mr. Poole directly the questions in the Schedules or Statement of Financial Affairs.  Mr. Danowitz testified that if he does not have a prior case template, he asks his clients each specific question.

Mr. Danowitz and Mr. Poole met again on November 1, 2017, for approximately an hour to review the schedules and the information provided by Mr. Poole.  On November 8, 2017, Mr. Danowitz and Mr. Poole met again for approximately 45 minutes to review and sign the bankruptcy petition and Schedules, all of which were filed on that day.  The litigation between Mr. Poole and his ex-wife was disclosed, but there was no disclosure of the lawsuit against Mr. Lang or the potential claim against the Chapter 13 attorney on either the Statement of Financial Affairs or Schedule B and Mr. Lang was not listed as a creditor in Schedule F or identified on the mailing matrix.  Mr. Danowitz stated he did not believe the claim against the Chapter 13 attorney was viable and therefore need not be listed.

The Schedules filed in the Florida and Georgia cases are similar, but they are not identical. For example, in the Florida bankruptcy case, the Debtor's Schedules listed two cars while in Georgia it listed only one.  The Debtor states he still had both cars in Georgia.  The values of the home, the car, and the personal property are different in the Georgia bankruptcy case from the values listed in the Florida bankruptcy case.  The creditors listed in the Georgia bankruptcy case

8

are mostly the same and scheduled for the same amounts as in the Florida bankruptcy case because Mr. Danowitz used the claims which were scheduled or filed in the Florida case as a basis for the Georgia schedules.  But new creditors were added to the Georgia schedules, including the IRS and Mr. Poole's ex-wife.

On December 16, 2017, the first meeting of creditors was held with Ed Palmer serving as Chapter 7 Trustee.  The meeting lasted about 20 minutes and at that meeting, the following exchange occurred:

Q: Nobody owes you any money I'm presuming?

A: No.

Q: No potential lawsuits you've got that you could file?

A: Against – it's been suggested I sue the 13 bankruptcy attorney, but I – we didn't file a lawsuit.

Q: The question with that is would it be cost effective.

A: Yeah, exactly.

Q: So no lawsuits is what I'm hearing you say?

A: No.

Prior to this exchange, Mr. Poole had discussed with Mr. Palmer the possible malpractice action against his Chapter 13 attorney and that it was not disclosed because it was deemed to be of little merit.  But then the conversation turned to another law firm scheduled in Mr. Poole's Schedule B and, in that process, the following occurred:

Q: I got you.  They have the attorney's fees debt for 13.  However, that's – every lawyer –

A: No, no.  That's different – different attorney.

Q: Different attorney?

Mr. Danowitz: That's the divorce lawyer.

By the witness: (resuming) A: That's the divorce attorney, yes.  That is the divorce
attorney.  And I paid him probably 60 before that.

Mr. Poole received a discharge on February 12, 2018.  In the months that followed, Mr.

Poole periodically communicated with Mr. Danowitz regarding his mortgage and potential

mortgage modification.  On June 12, 2018, Mr. Poole sent an email to Mr. Danowitz as follows:

I didn't hear back from you in response to my last few emails back in the spring in
trying to save my home (and I realize your services are complete) but another issue
has raised its head which does require a reply and your input … and I am sorry for
it's sudden urgency.

I do not know if you remember but in our discussion of my financial situation, I
shared with you that I had filed a lawsuit against an attorney in Florida.  I remember
your expressing your opinion of the likelihood of its success and everything that
goes with that.

Anyway, unknowingly to me, the other party moved the ball a bit and surprised my
attorney's with pursuing some exordinate (sic) fees in a partial judgment which
they won and which have been awarded.  That award was made approx two weeks
before my bankruptcy case was signed in February.

My Florida attorneys are now asking you to go back to the Court and amend that
case to include that judgement.

I am very sorry for this issue now raising its head.  It is certainly not any plan of
my making but important according to my Florida litigation attorneys.  They have
advised that this issue needs to be filed immediately and without delay.

The Florida judgment is attached.

Mr. Danowitz testified he thought Mr. Poole was referring to a suit against his Chapter 13 attorney.

The email states, however, that the Florida judgment for Mr. Lang was attached.  Mr. Poole sent

another email to Mr. Danowitz on June 13, 2018, with the heading "Re: Partial Summary

Judgement requires amendment to Bankruptcy".  It states as follows:

I just called and left you a voicemail regarding this issue.  When we were going
through the process of the bankruptcy, we discussed my case against the Florida
attorney who botched my case and the attorney who had filed against him on my

> behalf. I was unaware that the defendant took actions to hurry through a partial judgment and it additionally caught my attorney by surprise. Per the attachment I sent you previously, they did receive a partial judgment in their favor but that occurred a couple of weeks before the bankruptcy court finally ending my case. It is my attorney's belief that the judgement can be added to the list of items I sought relief from.
>
> I know this is likely the last issue you want to address at this time and I'm sorry for it popping up four months after we thought it was resolved. For what it's worth, the attorney we are suing (the same one who has obtained a partial judgment) was repeatedly asked to seek permission from the Florida Bankruptcy Court for approval of his fees. He was supposed to have handled my case for $30,000 but instead ran it up to over $160,000 and never contacted the Florida Bankruptcy Court when I was in my Chapter 13.
>
> Again, sorry for resurfacing but my attorneys need me to pursue amending the Chapter 7 to include that February 2018 judgement.

Mr. Danowitz spoke with Mr. Allen, one of Mr. Poole's attorneys involved in the Lang litigation and, on June 21, 2018, forwarded research to him in support of the proposition that a judgment obtained in violation of the stay is void and even unscheduled claims are discharged. Mr. Allen's firm filed responses to discovery in aid of execution on June 21, 2018, stating that Mr. Poole was amending or had amended his Chapter 7 case. Mr. Allen followed up again with Mr. Danowitz on August 16, 2018, stating as follows:

> I am filing a motion for a protective order in Mr. Poole's malpractice case and need a copy of the motion you filed to reopen the Bankruptcy Case to attach to the motion. I would like to file this today so if you could have your assistant send me a copy it will be appreciated.

Mr. Danowitz responded:

> Rick
>
> I haven't filed any motion to reopen. You and I discussed the possibility of doing so and the risk that Mr. Poole has nothing to gain from reopening the case.
>
> I also haven't discussed with Mr. Poole the cost of doing so, including the $360 filing fee to reopen and my fees for doing so.

If I do file, I will need to review the pleadings in the pending action so that I can explain to the court and the Trustee the need to reopen and the benefit to the estate for doing so.

Do you have time today for a three-way call with Mr. Poole?

Mr. Allen responded again:

I am in a meeting but will step out any time you want to discuss. It was my understanding when we talked a couple of weeks ago that you had already filed the motion to reopen. I thought I heard you say it would take 10 days for the court to respond. I apparently misunderstood.

Mr. Danowitz did not file a motion to reopen the case. Mr. Danowitz stated several reasons for not reopening the bankruptcy case. He testified he referred Mr. Poole to other attorneys to see if it was prudent to reopen the case. (Presumably, this was Mr. Allen, who thought Mr. Danowitz had reopened the case.) Mr. Danowitz also said he did not reopen the case because he did not know what would happen and a reopening might prompt some "credibility" issues with the Trustee. Mr. Danowitz knew the judgment was entered on a counterclaim, but he did not know or investigate the basis of the claim in chief (the malpractice claim) or when the lawsuit was filed. Finally, he says he was not retained to reopen the case, despite the numerous requests from Mr. Poole and Mr. Allen that he do so.

In the meantime, the attorney for Mr. Lang in the malpractice action contacted Ed Palmer in early July 2018 to inform him of the judgment Mr. Lang had obtained for his attorney's fees and the pending malpractice action. Mr. Palmer notified the U.S. Trustee of such on July 6, 2018. Seven months later, the U.S. Trustee moved to reopen Mr. Poole's Georgia bankruptcy case and filed this adversary proceeding. Mr. Danowitz finally amended the schedules on February 27, 2019, to disclose the claim of Mr. Lang and to disclose the malpractice claim asserted by Mr. Poole against Mr. Lang. The dismissal of Mr. Poole's malpractice claim in January 2019 was without

prejudice to the Trustee.  However, Mr. Palmer filed a report of no distribution on September 24, 2019, indicating the claim had no value.

## LEGAL ANALYSIS

### I.    Revocation of Discharge

"Revocation of discharge is an extraordinary remedy that directly rescinds the 'fresh start' to debtors that bankruptcy is meant to provide." Underwood v. Britt & Sons Elec. Wholesale, Inc. (In re Underwood), 2013 WL 4517905, at *2 (Bankr. N.D. Ga. Aug. 15, 2013) (citations omitted). It is viewed "as an extreme remedy to be awarded only where the debtor's conduct was egregious." In re Landry, 350 B.R. 51, 59 (Bankr. E.D. La. 2006).  This remedy "should be construed liberally in favor of the debtor[.]" Underwood, 2013 WL 4517905, at *2 (citation omitted); see also In re Cooper, 2017 WL 945085, at *3 (Bankr. N.D. Ga. Mar. 9, 2017).  The U.S. Trustee bears the burden of proving the application of section 727(d) by a preponderance of the evidence.  Cooper, 2017 WL 945085, at *3 (citing Gebhardt v. Seedor (In re Seedor), 2014 WL 1600857, at *5 (Bankr. M.D. Fla. Apr. 17, 2014)).

Section 727(d) empowers a court to revoke a debtor's discharge on request of the trustee, a creditor, or the U.S. Trustee, after notice and a hearing, in four situations, one of which is relevant here: the "discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge."  11 U.S.C. §727(d)(1).  In the Eleventh Circuit, courts look for three criteria to satisfy section 727(d)(1): "(1) the debtor obtained the discharge through fraud; (2) the [moving party] possessed no knowledge of the debtor's fraud prior to the granting of the discharge; and (3) the fraud, if known, would have resulted in the denial of the discharge under [section] 727(a)." The Cadle Co. v. Parks–Matos (In re Matos), 267 F. App'x 884, 887 (11th Cir. 2008) (per curiam); Cooper, 2017 WL 945085, at *3.  There is no

dispute the U.S. Trustee did not know of the Debtor's alleged fraud prior to the entry of his discharge, so the second requirement is met. The question is whether the U.S. Trustee has proved the first and third prongs.

The plaintiff seeking revocation must prove fraud in the procurement of the discharge, not just fraud toward a creditor. In re Zilberbrand, 602 B.R. 53, 57 (Bankr. N.D. Ill. 2019); In re Stedham, 327 B.R. 889, 897 (Bankr. W.D. Tenn. 2005), aff'd, 2006 WL 8463575 (W.D. Tenn. May 22, 2006) ("Under § 727(d)(1), it is the debtor's fraud in obtaining the discharge that qualifies as grounds for revocation and not the debtor's fraud vis-a-vis the creditor."). The plaintiff must prove the debtor committed "fraud in fact." In re Simmons, 2018 WL 1513545, at *2 (Bankr. N.D. Ga. Mar. 27, 2018). "To find the requisite degree of fraudulent intent under [section] 727(d), the court must find the debtor knowingly intended to defraud[]or engaged in such reckless behavior as to justify the finding of fraud." Landry, 350 B.R. at 59 (citation omitted).

The fraud required to satisfy section 727(d)(1) may be satisfied by the same fraud justifying denial of discharge under section 727(a). Courts frequently find that the fraudulent intent required for sections 727(a)(2) and (a)(4) is sufficient to revoke a discharge under section 727(d), provided that such fraud is directed at the estate, the Trustee, or the bankruptcy process, and not just at a creditor. See In re Washabaugh, 572 B.R. 141, 151 (Bankr. M.D.N.C. 2017). Not every basis for denial of discharge is based on fraud, though, so those bases alone would not support a revocation of discharge. Instead, a separate act of fraud would be required. Thus, the fraud required for section 727(d) is not limited to the acts justifying a denial of discharge.[1]

---

[1] For example, in In re Zilberbrand, 602 B.R. at 53, the fraud occurred at a hearing on a motion to dismiss after the deadline to file a complaint under section 727 ran. The court concluded that section 727(d)(1) demands only that the debtor obtained his discharge through fraud, and even though a denial of discharge would not have been possible due to the expiration of the deadline to object, revocation may be appropriate.

The U.S. Trustee argues revocation is warranted because Mr. Poole committed fraud in fact by knowingly and fraudulently making false oaths and, with intent to defraud the Trustee, concealed the lawsuit against Mr. Lang.  The U.S. Trustee argues the Debtor would have been denied a discharge under sections 727(a)(2) and 727(a)(4).  The U.S. Trustee contends Mr. Poole is a sophisticated debtor who intentionally failed to disclose both Mr. Lang as a creditor and his pending lawsuit against Mr. Lang to avoid paying his ex-wife from any money he may recover. The U.S. Trustee states Mr. Poole was actively involved in the lawsuit when he filed bankruptcy and his omission was not a mistake.

Mr. Poole contends he did not intentionally omit either Mr. Lang or the lawsuit and, accordingly, revocation is not appropriate.  He states he was unaware of Mr. Lang's counterclaim and did not realize that Mr. Lang would have been considered a creditor.  As to the lawsuit, Mr. Poole believed he had disclosed it or at least discussed it with Mr. Danowitz.  Mr. Poole also contends that the complaint is not timely.  The Court will address the timeliness of the complaint before turning to consider the merits.

## II.    Timeliness of Complaint

The time limit within which one may request revocation of a discharge under section 727(d) is governed by section 727(e).  Pursuant to section 727(e)(1), the trustee, a creditor or a United States trustee may request revocation of a discharge "within one year after such discharge is granted[.]"  11 U.S.C. § 727(e)(1).  The year begins to run "from the date of entry of the order of discharge, and not from the discovery of the fraud."  Pierre v. Welfare (in Re Pierre), 198 B.R. 389, 392 (Bankr. S.D. Fla. 1996) (citations omitted).  Bankruptcy Rule 9006 provides that in computing any period of time, the day of the act from which the designated period of time begins to run shall not be included.  Fed. R. Bankr. P. 9006(a)(1)(A).  Bankruptcy Rule 9006 further

provides that the last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday, in which event the period runs until the end of the next day which is not one of the aforementioned days.  Id.

In In re Morris, 2008 WL 819296 (Bankr. D. Kan. Mar. 26, 2008), the order of discharge was entered on January 31, 2006.  The complaint to revoke the debtor's discharge was filed on January 31, 2007.  The debtor argued the complaint was filed one day late.  The court looked to Bankruptcy Rule 9006 and the text of section 727(e) and determined "the cut off starts 'after' the granting of the discharge, which means the day following the granting of discharge."  Id. at *4. "The period of one year therefore runs for one year after that date[.]"  Id.  The court concluded the complaint was timely.

In this case, the order of discharge was entered on February 12, 2018, and the case was closed on the same date.  The U.S. Trustee filed the complaint to revoke discharge on February 12, 2019.  As explained in Morris, the one-year period does not commence until the day after the discharge order is entered.  The time period began to run on February 13, 2018, and the Complaint was filed on February 12, 2019, within a year of that date.  Accordingly, the Court concludes the Complaint is timely and will now consider whether revocation is warranted.

### III.    Knowing and Fraudulent False Oath

A complaint seeking revocation of discharge may be based on a determination under section 727(a)(4) that the debtor knowingly and fraudulently made a false oath or account in connection with his bankruptcy case.  In re Paul, 2012 WL 4894581, at *3 (Bankr. N.D. Ga. Aug. 20, 2012) (citation omitted); see also Cooper, 2017 WL 945085, at *3.  Under section 727(a)(4), a plaintiff must prove:

1)      the debtor made a statement under oath,

2)      the statement was false,

3)      the debtor knew the statement was false,

4)      the debtor made the statement with fraudulent intent, and

5)      the statement related materially to the bankruptcy case.

In re Roubieu, 2005 WL 6459370 (Bankr. N.D. Ga. July 6, 2005).

It is undisputed that Mr. Poole's omissions in the Schedules, Statement of Financial Affairs, and at his 341 meeting were under oath.  A debtor's statements and schedules are executed under oath and penalty of perjury.  Fed. R. Bankr. P. 1008; Official Form 1 (Voluntary Petition); Official Form 7 (Statement of Financial Affairs); see also Beaubouef v. Beaubouef (In re Beaubouef), 966 F.2d 174, 178 (5th Cir. 1992).  Likewise, statements made at a debtor's section 341 meeting of creditors are made under oath. 11 U.S.C. § 343 ("The debtor shall appear and submit to examination under oath at the meeting of creditors under section 341(a) of this title."); Fed. R. Bankr. P. 2003(c); In re Heil, 289 B.R. 897, 907–08 (Bankr. E.D. Tenn. 2003).  Moreover, "[a] deliberate omission may constitute a false oath." In re Reynolds, 2015 WL 6520157, at *5 (Bankr. N.D. Ga. Sept. 18, 2015) (citing Phillips v. Epic Aviation (In re Phillips), 476 Fed. Appx. 813, 816 (11th Cir. 2012)).

It is also undisputed that omitting Mr. Lang as a creditor and omitting the lawsuit against Mr. Lang from the Schedules and Statement of Financial Affairs were false statements.  On Schedule B, Mr. Poole failed to identify his claim against Mr. Lang in answer to the question:

Do you own or have any legal or equitable interest in any . . .

Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment[?]

On his Statement of Financial Affairs, Mr. Poole failed to disclose that he was a party in any lawsuit, court action, or administrative proceeding against Mr. Lang in response to the question:

17

> Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding? List all such matters, including personal injury cases, small claims actions, divorces, collection suits, paternity actions, support or custody modifications, and contract disputes.

Mr. Poole disclosed the civil suit his ex-wife had filed against him, but he omitted his lawsuit against Mr. Lang.  Further, Mr. Lang held a claim against the Debtor, albeit disputed, which should have been reflected on Schedule F.  All three omissions were false.

The issue of falsity at the 341 meeting is more difficult.  Mr. Poole responded to three relevant questions at the 341 meeting.  First, the Trustee asked, "Nobody owes you any money I'm presuming?"  Mr. Poole answered "No."  The lawsuit against Mr. Lang clearly demands money from him, so this answer is false.  Second, the Trustee asked: "No potential lawsuits you've got that you could file?"  At the time of the 341 meeting of creditors, the case against Mr. Lang was not a potential lawsuit; it had already been filed.  Mr. Poole could have responded disclosing his pending claims against Mr. Lang, but, technically, the Trustee's question only asked about "potential" lawsuits and Mr. Poole answered the question that was asked.  Finally, the Trustee stated, "So no lawsuits is what I'm hearing you say?"  Mr. Poole again responded "No."  This question was asked immediately following the question about potential lawsuits, so it could have been understood as only about any potential lawsuits.  No questions about pending lawsuits were asked.  The Court concludes Mr. Poole's answers to the last two questions were not false.

A false statement is material if "it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."  Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 618 (11th Cir. 1984) (citation omitted).  A debtor "is not permitted to decide to omit an asset because the debtor believes it lacks value."  In re Heil, 289 B.R. at 908 (citation omitted).  A debtor is charged with answering the questions accurately and completely and is obligated to disclose even worthless

assets.  See In re Tylee, 512 B.R. 409, 416–17 (Bankr. E.D.N.Y. 2014).  "[W]hile the omission of worthless assets may be material, the value of the asset omitted may be evidence of the debtor's intent, or lack thereof, to deceive." In re White, 568 B.R. 894, 913 (Bankr. N.D. Ga. 2017) (citation omitted).   Here, the claim against Mr. Lang was material.   The Debtor valued it at between $990,000 and $2.1 million, and the lawsuit was property of the estate.  Mr. Lang's claim against the Debtor was also material as it was in the amount of $66,293.49.

Since the omissions in Debtor's Schedules and Statement of Financial Affairs and the failure to answer one of the questions at the 341 meeting were under oath, false, and material, the question is whether Debtor knew his omissions to be false and whether they were made with fraudulent intent.  "A debtor knows their statement is false when he or she 'knew the truth, but nonetheless failed to give the information or gave contradicting information.'"  In re Christian, 615 B.R. 240, 247–48 (Bankr. M.D. Tenn. 2020) (citation omitted).

Fraudulent intent involves a material representation that a debtor knows to be false or an omission the debtor knows will create an erroneous impression.   In re Heil, 289 B.R. at 908 (citation omitted).  "Proving that a debtor's actions were taken knowingly and with fraudulent intent is not a simple matter, for it is rare that one will willingly provide direct evidence of fraudulent intent." In re Franco, 600 B.R. 355, 359 (Bankr. S.D. Tex. 2019).  "[A]ctual intent may be inferred from circumstantial evidence[,]" including course of conduct.  In re White, 568 B.R. at 913 (citation omitted); Landry, 350 B.R. at 59 (citation omitted).   Further, "a reckless indifference to the truth is sufficient to constitute the requisite fraudulent intent for denying a discharge under section 727".  In re White, 568 B.R. at 913 (citation omitted).  A determination of fraudulent intent "depends largely upon an assessment of the credibility and demeanor of the debtor."  Washabaugh, 572 B.R. at 151 (citation omitted).

A series or pattern of errors or omissions may indicate fraudulent intent.  Franco, 600 B.R. at 360 (citing The Cade Company v. Guenther (In re Guenther), 333 B.R. 759, 767-68 (Bankr. N.D. Tex. 2005)).  "While multiple inaccuracies are usually evidence of a pattern of reckless and cavalier disregard for the truth serious enough to supply the necessary fraudulent intent", Landry, 350 B.R. at 59–60, a single instance, or a few minor instances, are often the result of an innocent mistake and generally insufficient for finding fraudulent intent.  Christian, 615 B.R. at 248; see also Franco, 600 B.R. at 360 (mistakes per se not enough to bar a discharge).  The debtor's lack of understanding bankruptcy matters may weigh against a finding of intent.  Christian, 615 B.R. at 248.

A debtor's ready disclosure when questioned will also weigh against a finding of intent. See id.  Courts generally find a debtor's willingness to acknowledge his mistake and amend his schedules and/or report an omission or mistake is inconsistent with the intent to defraud.  Kovacs v. McVay (In re McVay), 363 B.R. 824 (Bankr. N.D. Ohio 2006).

With the legal landscape set out, the Court will evaluate the omissions identified by the U.S. Trustee to determine if she carried her burden of showing the Debtor knew his omissions were false and made them with intent to defraud.

a.  Failure to List Mr. Lang as a Creditor

Mr. Poole did not list Mr. Lang as a creditor.  Some courts have said failure to list a creditor constitutes a false oath sufficient to deny a discharge in total.  But this Court holds that failure to list a creditor is not sufficient, by itself, to constitute grounds to revoke a debtor's discharge because the Bankruptcy Code provides a separate remedy for such an omission.  The remedy is provided in section 523(a)(3), which makes unscheduled debts nondischargeable, but only under limited circumstances.

Under section 523(a)(3), a debt that is not listed or scheduled is not discharged, but only if the creditor has insufficient time to file a timely proof of claim or to file a timely dischargeability complaint under sections 523(a)(2), (a)(4), or (a)(6), which deal with debts that arise from intentional torts.  Otherwise, the unscheduled debt remains discharged.  In a no-asset Chapter 7 case, such as this one, where no bar date was set, a creditor can still file a timely proof of claim, so the unscheduled debt remains discharged.  In re Bledsoe, 2013 WL 3776350, at *2–3 (Bankr. N.D. Ga. June 11, 2013).[2]  Further, Mr. Lang holds a contract claim and not a claim for an intentional tort that falls within the parameters of sections 523(a)(2), (4), or (6).  Since Congress has provided for the discharge of unscheduled debts like Mr. Lang's, the failure to schedule Mr. Lang's claim should not result in a denial of discharge in total.

Further, the U.S. Trustee has not met her burden to show Mr. Poole knew the omission of Mr. Lang from the Schedules was false and that he made the omission with fraudulent intent.  As of the petition date, Mr. Poole did not know of Mr. Lang's counterclaim against him.  He only knew the charging lien asserted by Mr. Lang had been denied.  It was not until early 2018 that he became aware of the counterclaim.  While Mr. Poole should have understood Mr. Lang might have a claim against him, since the malpractice action was pitched as a preemptive strike, the Court finds it believable that Mr. Poole did not think of Mr. Lang as a creditor.  Mr. Poole stated he did not know parties in litigation were creditors; he thought the term "creditor" only meant creditors that had extended credit "like Sears."  Accordingly, the Court finds the U.S. Trustee has failed to

---

[2] Further, "[a]s a general rule, to obtain relief under § 727(d)(1), it is insufficient that a debtor's fraud rendered a particular debt nondischargeable; claimant must allege that the entire discharge would not have been granted but for debtor's fraud."  In re Maddox, 574 B.R. 127, 131 (Bankr. E.D. Tenn. 2017) (citation omitted).  The types of fraud that would prevent a debtor from receiving a discharge are different from the acts listed in section 523, which will result in the denial of the discharge of a particular debt.  Id.; see Franco, 600 B.R. at 358; see also In re Bowman, 173 B.R. 922 (B.A.P. 9th Cir. 1994) (creditor might have a claim under section 523(a) for a determination as to the dischargeability of a debt, but the conduct complained of did not form a sufficient basis to object under section 727(d)(1) where there was "absolutely no evidence" the debtor had procured his discharge through fraud).

prove by a preponderance of the evidence that Mr. Poole acted with the requisite intent when he

failed to list Mr. Lang as a creditor on his bankruptcy schedules.

> b. <u>Failure to List Lawsuit in Schedule B and Statement of Financial Affairs</u>

Mr. Poole failed to schedule his claim against Mr. Lang as an asset or to identify it in his

Statement of Financial Affairs.  Schedule B asks:

> Do you own or have any legal or equitable interest in any . . .
>
> Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment[?]

Debtor answered "No."  In his Statement of Financial Affairs, Mr. Poole was asked to

identify legal actions:

> Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?  List all such matters, including personal injury cases, small claims actions, divorces, collection suits, paternity actions, support or custody modifications, and contract disputes.

Mr. Poole disclosed the civil suit his ex-wife filed against him, but he omitted his lawsuit against

Mr. Lang.

Mr. Poole clearly knew of the lawsuit, and he was very active in it.  At the very same time

he was working on his bankruptcy schedules with Mr. Danowitz, he was actively involved in

discovery with Mr. Lang.  He sent communications to his Florida counsel asking about upcoming

deadlines and following up on actions in the case.  Mr. Danowitz gave him the bankruptcy

schedules to review, and he did not make any changes to the responses.

But it is equally likely that there was a genuine mistake about disclosure of the claim

against Mr. Lang.  The bankruptcy schedules were initially drafted using Mr. Poole's prior Chapter

13 bankruptcy case as a template.  Mr. Danowitz did not go question by question with Mr. Poole

as he would have had Mr. Poole not previously filed bankruptcy.  It is not difficult to imagine that

Mr. Poole may not have realized that a pending lawsuit qualified as a claim, and it is plausible he misunderstood the question.  The questions on the Schedules and Statement of Financial Affairs that are clear to judges and lawyers are not always clear to individuals.  A debtor may simply fail "to disclose a pending lawsuit because he did not understand the disclosure obligations."  Slater v. United States Steel Corp., 871 F.3d 1174, 1186 (11th Cir. 2017).  As the Eleventh Circuit has noted:

> It is not difficult to imagine that some debtors . . . may not realize that a pending lawsuit qualifies as a 'contingent and unliquidated claim' that must be disclosed on a schedule of assets.  Although the question asking for a list of 'all suits and administrative proceedings to which the debtor is or was a party' seems more straightforward, . . . it nevertheless may be misunderstood.

Id.[3]  That is why it is important for debtor attorneys to discuss each question with the client and explain the full scope of each.  The Court finds credible Mr. Poole's testimony that he did not understand that his lawsuit against Mr. Lang constituted a contingent and unliquidated claim.

Mr. Poole also testified that he thought he told Mr. Danowitz about the lawsuit.  Mr. Poole stated that, at a minimum, he believed the lawsuit would have been discovered when Mr. Danowitz reviewed his prior Chapter 13 case.  At their initial meeting, Mr. Danowitz and Mr. Poole discussed Mr. Poole's litigation with his ex-wife, the status of the divorce, and a potential claim that Mr. Poole thought he had against his Florida Chapter 13 attorney.  While Mr. Danowitz stated he had no recollection of discussing the suit against Mr. Lang, he acknowledged it is possible Mr. Poole mentioned a malpractice action against Mr. Lang, but that he confused that malpractice action with the potential malpractice claim against the Chapter 13 attorney.  He acknowledged Mr. Poole's "communication was not as clear as I hoped" and he might have misinterpreted it.

---

[3] The Slater opinion addressed the application of judicial estoppel.

After receiving his discharge, Mr. Poole continued to communicate with Mr. Danowitz and his emails demonstrate likely confusion about which attorney Mr. Poole had been referring to in earlier conversations.  In an email dated June 12, 2018, Mr. Poole stated:

> I do not know if you remember but in our discussion of my financial situation, I shared with you that I had filed a lawsuit against an attorney in Florida.  I remember your expressing your opinion of the likelihood of its success and everything that goes with that.

> Anyway, unknowingly to me, the other party moved the ball a bit and surprised my attorney's with pursuing some exordinate (sic) fees in a partial judgment which they won and which have been awarded.  That award was made approx two weeks before my bankruptcy case was signed in February.

According to the email, Mr. Poole had previously disclosed to Mr. Danowitz that he had filed a lawsuit against "an attorney in Florida."  The email does not identify the attorney by name, and Mr. Danowitz said he thought it was the Chapter 13 attorney because he remembered opining that a suit against the Chapter 13 attorney was not viable.  The following paragraph, however, makes clear to the Court now that Mr. Poole was referring to Mr. Lang.  In the very same email, in which he refers to Mr. Lang as "an attorney in Florida," Mr. Poole refers to a different set of attorneys as "My Florida attorneys."

Mr. Poole followed up with an email on June 13, 2018, in which he stated, "When we were going through the process of the bankruptcy, we discussed my case against the Florida attorney who botched my case and the attorney who had filed against him on my behalf."  Mr. Poole again did not refer to Mr. Lang by name; instead, he referred to him as "the Florida attorney."  Mr. Poole has been represented by several different Florida attorneys, and he seemingly refers to each of them at one point or another simply as a Florida attorney.  Mr. Poole's emails cover a significant swath of history, in a non-linear fashion, without providing any names.  His presentations in court in this case have been similar.  It is not hard to fathom that a similar conversation transpired

between Mr. Poole and Mr. Danowitz when they met to discuss Mr. Poole's bankruptcy case and that Mr. Danowitz may have been confused as to which attorney Mr. Poole had a claim against.

At one point during the 341 meeting, the Trustee himself was confused about which attorney had a claim for fees. Mr. Palmer thought Mr. Poole was referring to his Chapter 13 attorney when, in fact, Mr. Poole had been discussing his original divorce attorney. Mr. Poole did not refer to either by name. It seems that Mr. Poole was aware of which attorney he was discussing, but the manner in which Mr. Poole referred to various attorneys without names, and not necessarily in chronological order, confused even the Trustee. The interaction demonstrates that discussions with Mr. Poole about his attorneys, of which there have been many, can be confusing even to an experienced attorney.

Further, Mr. Poole made efforts to amend his bankruptcy schedules to disclose the lawsuit. In June 2018, before Mr. Lang's attorney contacted the Trustee, Mr. Poole asked Mr. Danowitz to amend his bankruptcy schedules. He sent an email on June 12, 2018, asking Mr. Danowitz to "go back to the Court and amend that case to include that judgement." The following day, he sent Mr. Danowitz a second email asking Mr. Danowitz "to pursue amending the Chapter 7 to include that February 2018 judgment." In that same email, he states he called Mr. Danowitz and left a voicemail about the same issue. The emails show Mr. Poole attempted to contact Mr. Danowitz several times to urge him to amend the bankruptcy schedules. Mr. Poole wondered aloud at the trial whether this litigation would have been avoided if Mr. Danowitz had moved to reopen the case at an earlier point.[4] Although it was Mr. Lang's judgment that prompted the contact with Mr. Danowitz, the email sent to Mr. Danowitz included the judgement as an attachment (which showed the case style). This is evidence Mr. Poole was not hiding the action.

---

[4] The Court expresses no opinion on the matter, but it notes it is not uncommon for the Court to receive motions to reopen to add a lawsuit as a claim. Such motions are routinely granted, and cases reopened, without further litigation.

The U.S. Trustee suggests Mr. Poole did not disclose the lawsuit against Mr. Lang to avoid paying his ex-wife.  Undoubtedly Mr. Poole did not want any funds to go to his ex-wife who allegedly "ruined his life."  But, when this theory was presented to Mr. Poole on the stand, Mr. Poole did not seem to understand that any money obtained from the lawsuit would go to her.  The Court finds his testimony credible.

Mr. Poole is a sophisticated debtor—he is a commercial real estate agent with a master's degree who was in the midst of contentious litigation when he filed his Chapter 7 bankruptcy case. These circumstances, however, only lead to a suspicion that Mr. Poole knowingly and fraudulently failed to list his lawsuit against Mr. Lang.  Mere suspicion is insufficient to demonstrate the intent required by section 727(a)(4).  See In re Strauss, 2017 WL 4224090 (N.D. Ga. June 15, 2017) (while the debtor's education and training as a lawyer may have led to a suspicion or inference that the debtor acted in bad faith when she omitted information from her schedules, her testimony did "not show a deliberate omission that constituted a misuse or abuse of the provisions, purpose, or spirit of the Bankruptcy Code."); see also Christian, 615 B.R. at 248 ("Lay individuals are not expected to understand the intricacies of the bankruptcy process; if it were so simple, attorneys before this Court would find themselves largely out of work.").  Further, revocation is an extreme remedy to be construed liberally in favor of the debtor.  Underwood, 2013 WL 4517905, at *2. Accordingly, construing the evidence liberally in favor of Debtor as the Court must, the Court finds the U.S. Trustee has failed to prove by a preponderance of the evidence that Mr. Poole's failure to list his claim against Mr. Lang in Schedule B and the Statement of Financial Affairs was done knowingly and with fraudulent intent.

c. <u>Meeting of Creditors Testimony</u>

Lastly, the U.S. Trustee contends the Debtor answered questions falsely at his 341 meeting. As discussed above, the Court concludes not all of his answers were false, but even if so, the U.S. Trustee has not proved he knew them to be false and made them with fraudulent intent.

First, the Trustee asked, "Nobody owes you any money I'm presuming?"  Mr. Poole answered "No."  While a lawsuit should be disclosed in answer to that question, Mr. Poole did not understand that parties to a lawsuit are creditors.  As with the omission on Schedule B, the U.S. Trustee has not satisfied her burden to show Mr. Poole intentionally failed to mention his lawsuit against Mr. Lang in response to this question.  His answer was more likely the result of a misunderstanding.

Second, the Trustee asked: "no potential lawsuits you've got that you could file?"  At the time of the 341 meeting of creditors, the case against Lang was not a <u>potential</u> lawsuit that could be filed.  It had already been filed.  Mr. Poole talked about the lawsuit against his former Chapter 13 lawyer as a potential lawsuit.  Arguably, since he disclosed and discussed his claim against his former Chapter 13 attorney, Mr. Poole could have discussed his pending claims against Mr. Lang. While it seems that his silence was intentional, technically, the Trustee's question was limited to "potential" lawsuits and Mr. Poole answered the question as posed.  As discussed above, construing the evidence liberally for the Debtor, Mr. Poole's answer was not false.  But, even if it was, the phrasing of the question convinces the Court such an answer was not intentionally false or given with fraudulent intent.

Finally, the Trustee stated, "So no lawsuits is what I'm hearing you say?"  Mr. Poole again responded "No."  This question was posed as a follow up to the question about potential lawsuits. Again, while Mr. Poole undoubtedly knew of his lawsuit against Mr. Lang, it is possible that Mr.

Poole construed it as the Trustee asking him about whether he had any <u>potential</u> lawsuits. The U.S. Trustee has failed to prove Mr. Poole deliberately answered the question incorrectly. Accordingly, the Court finds Plaintiff has failed to prove by a preponderance of the evidence that Mr. Poole made false statements at his meeting of creditors that he knew to be false with fraudulent intent, as required by section 727(a)(4).

## IV.     <u>Transfer, Removal, or Concealment of Property</u>

The fraud necessary for revocation of the discharge may also be based on conduct falling under section 727(a)(2), so long as the intent is to defraud the Trustee. That section provides the court shall grant a discharge unless:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
> > (A) property of the debtor, within one year before the date of the filing of the petition; or
> > (B) property of the estate, after the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2). To <u>deny</u> a debtor a discharge under this section, the plaintiff must show the debtor transferred or removed or concealed his property, within the requisite time period, and had the requisite intent to hinder, delay or defraud.

Concealment under section 727(a)(2) involves "a secreting of assets[,] e.g. the hiding of assets from the reach of creditors for the purpose of secretly exempting a portion of the estate which would otherwise be payable to creditors through the bankruptcy proceeding." <u>In re Haynes</u>, 549 B.R. 677, 686 (Bankr. D.S.C. 2016) (citation omitted). Concealment through omissions from the statements of financial affairs and schedules is covered by section 727(a)(4), as discussed above, not section 727(a)(2)(A). <u>In re Osborne</u>, 476 B.R. 284, 293 (Bankr. D. Kan. 2012); <u>In re Haynes</u>, 549 B.R. at 686.

## CONCLUSION

Revocation of discharge is an extreme remedy to be awarded only where the debtor's conduct was egregious.  The U.S. Trustee bears the burden of proving the application of section 727(d) by a preponderance of the evidence; she has failed to do so here.  The U.S. Trustee has proven that Mr. Poole made false, material statements under oath, but has not proven that Mr. Poole knowingly and fraudulently failed to disclose both Mr. Lang as a creditor and his pending lawsuit against Mr. Lang.  The Court finds Mr. Poole was unaware of Mr. Lang's counterclaim and did not realize that he would have been considered a creditor.  As to the lawsuit, Mr. Poole was undoubtedly aware of it when he filed bankruptcy.  The U.S. Trustee, however, has not proven the omission was fraudulent, rather than the result of mistake or confusion with his attorney. Accordingly, the U.S. Trustee has failed to prove the requisite intent for revocation of discharge pursuant to section 727(d)(1).

**IT IS ORDERED** that the U.S. Trustee's claim for revocation of discharge is **DENIED and judgment is for the defendant Debtor**.

## END OF DOCUMENT

**<u>Distribution List</u>**

David S. Weidenbaum
Office of the U.S. Trustee
362 Richard B. Russell Bldg.
75 Ted Turner Drive, SW
Atlanta, GA 30303

Erik K. Poole
1034 Huntcliff N.E.
Atlanta, GA 30350